RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0157p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

IN RE: HNRC DISSOLUTION CO.,

*Debtor*.

───────────────────────────────────

ALLIANCE WOR PROPERTIES, LLC,

*Appellant*,

*v*.

ILLINOIS METHANE, LLC,

*Appellee*.

No. 20-5396

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Ashland;
No. 0:18-cv-00073—Henry R. Wilhoit, Jr., District Judge.

United States Bankruptcy Court for the Eastern District of Kentucky at Ashland;
No. 02-bk-14261—Tracey N. Wise, Judge.

Argued:  April 22, 2021

Decided and Filed:  July 12, 2021

Before:  GIBBONS, COOK, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Thomas C. Scherer, DENTONS BINGHAM GREENEBAUM LLP, Indianapolis, Indiana, for Appellant.  James L. Van Winkle, ILLINOIS METHANE, LLC, McLeansboro, Illinois, for Appellee.  **ON BRIEF:**  Thomas C. Scherer, DENTONS BINGHAM GREENEBAUM LLP, Indianapolis, Indiana, Christopher B. Madden, DENTONS BINGHAM GREENEBAUM LLP, Louisville, Kentucky, for Appellant.  James L. Van Winkle, ILLINOIS METHANE, LLC, McLeansboro, Illinois, Elizabeth Lee Thompson, Katie M. Glass, STITES & HARBISON PLLC, Lexington, Kentucky, for Appellee.

———————————

**OPINION**

———————————

LARSEN, Circuit Judge.  In 1998, the Old Ben Coal Company (Old Ben) conveyed its rights to the methane gas in various coal reserves to the appellee in this case, Illinois Methane, LLC (Methane).  As part of that $2.6 million transaction, Old Ben agreed to a "Delay Rental Obligation" that required the owner of the coal estate to pay rent to Methane while it mined the coal in areas that Methane had not yet exploited.  A deed memorializing this conveyance (and setting forth the Delay Rental Obligation) was then recorded with the county treasurer.

A few years later, Old Ben filed for bankruptcy protection.  As part of the proceedings, Old Ben purported to sell its coal interests "free and clear of any and all Encumbrances" to the Lexington Coal Company, a buyer who stands in privity with the appellant, Alliance WOR Properties, LLC (Alliance).  Old Ben did not, however, notify Methane prior to the bankruptcy sale. It merely circulated notice by publication in several newspapers.

Alliance's predecessor-in-interest later sought a permit to mine coal; and Methane eventually sought to collect the amount due under the Delay Rental Obligation in Illinois state court.  Alliance responded by filing in the bankruptcy court a motion to enjoin the state-court lawsuit, arguing that Old Ben's "free and clear" sale had extinguished Methane's interest in the land.  This was the first time Methane had learned of the bankruptcy proceedings.

The bankruptcy court held that Old Ben's publication notice had been insufficient to satisfy due process as to Methane.  Accordingly, the court ruled that the sale had not erased Methane's interest and that Alliance was not entitled to an injunction barring the State Court Action.  The district court affirmed.  For the reasons stated below, we AFFIRM as well.

I.

A.

Several decades ago, Old Ben acquired a block of coal reserves and leases in several Illinois counties.  The coal reserves also contained a rich supply of natural gas.  Though

simultaneous extraction of this coalbed gas and the coal itself was not yet "technologically feasible," Old Ben had not engaged in active coal mining operations for some time. So, on June 12, 1998, Old Ben conveyed the rights to "all of the methane gas" in its coal estates to Methane in exchange for $2.6 million. Old Ben retained the coal rights. And the deed memorializing this transaction was recorded in the Hamilton County Recorder's official records.

Old Ben's conveyance was made "[s]ubject to" a number of covenants "running with the ownership of the coal and methane gas." One of the covenants in the Old Ben Deed—the "Delay Rental Obligation"—is at the heart of this case. It provides that:

> If [Old Ben] applies to open a new mine, expand an existing mine, or reopen a closed or inactive mine, after notice to [Methane], [Methane] will not grant any additional leases or contracts for the exploration or production of methane gas within the area encompassed in the application . . . . If there are no outstanding leases of methane gas, or permits issued for the drilling of new methane gas wells within [the application area], then [Old Ben] shall pay [Methane] an adjusted delay rental[.]

The amount of this "adjusted delay rental" varied with "the number of acres [made] unavailable to [Methane] for methane gas production" and the prevailing price of light sweet crude oil. And the idea was that Methane would receive compensation until it could exercise its rights to commence "methane gas exploration and production from [the unexploited] area." Once again, the Old Ben Deed reiterated that if either party "convey[ed] the surface, coal[,] or methane gas, the above agreements, terms, and restrictions shall be covenants running with the land." Just a few months after the execution of the deed, Old Ben and its parent company, Ziegler Coal Holding Company, merged into AEI Resources.

B.

In 2002, AEI, Old Ben, and a number of other affiliates (collectively, the "Debtors"), filed a Chapter 11 bankruptcy petition. The Debtors moved for an order pursuant to 11 U.S.C. § 363 authorizing the sale of substantially all of their assets "free and clear of all Liens, Claims, encumbrances and other interests." That included Old Ben's coal reserves in Hamilton County. The Debtors published notice of the impending bankruptcy sale in several regional and national newspapers. But they did not provide or attempt to provide direct notice to Methane.

Presumably unaware of Methane's interest, the bankruptcy court found that the Debtors' publication notice was sufficient and that "no other or further notice [was] required." It granted the Debtors' motion and ordered that, with the exception of certain permitted liens, the purchasers would take title and possession of the Debtors' assets "free and clear of all Liens, Claims, interests, and other encumbrances." The court furthermore ordered that, "[n]otwithstanding any otherwise applicable law to the contrary," "all entities" that held "interests in [the Debtors'] property" were permanently barred from "commencing . . . any action or other proceeding of any kind with respect to any such . . . interest."

As part of the bankruptcy sale, Old Ben then conveyed its Hamilton County coal reserves to the Lexington Coal Company through a special corporate warranty deed. It is undisputed that Alliance is in privity with Lexington Coal as to its interest—whatever that may be—in the Hamilton County coal reserves once owned by Old Ben.

## C.

Eventually, one of Alliance's predecessors-in-title applied for a permit to mine coal from a portion of the Hamilton County reserves. Several years later, Methane filed an action against Alliance in Illinois state court (hereinafter, the "State Court Action"). In short, the complaint alleged that the predecessor's actions triggered the Delay Rental Obligation in the Old Ben Deed. Methane sought over $11 million in accumulated delay rentals and a declaration that the "covenants under the Old Ben Deed apply to all fee coal and leased coal acquired by Old Ben in Hamilton County." It also sought an equitable lien on Alliance's coal rights.

Soon thereafter, Alliance moved to reopen the bankruptcy case. It asked the bankruptcy court for "an order finding that [Methane]'s efforts to recover against Alliance violate the Sale . . . and Confirmation Orders and enjoining [Methane] from proceeding with the State Court Action or any other claims against Alliance relating to the Old Ben Coal Estate." This was the first time Methane learned about the bankruptcy case or any sales resulting therefrom.

Following two rounds of briefing and a merits hearing, the bankruptcy court held that the Debtors' notice by publication did not satisfy due process as to Methane, which had a "known" interest in Old Ben's coal reserves. Because the bankruptcy proceedings could "only enjoin

Methane if Methane received notice of them sufficient to satisfy constitutional due process," the court concluded that its prior orders "ha[d] no [e]ffect on Methane's Interest." It therefore denied Alliance's motion for an injunction and allowed the State Court Action to proceed. Largely for the reasons set forth in the bankruptcy court's opinion, the district court affirmed. Alliance timely appealed.

## II.

"We directly review a bankruptcy court's order when appealed from a district court." *In re Patel*, 565 F.3d 963, 967 (6th Cir. 2009). That is, "[w]e give no deference to the district court's decision." *In re Cook*, 457 F.3d 561, 565 (6th Cir. 2006). We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. *Id.*

This case turns on the constitutional sufficiency of the notice afforded to Methane. If the Debtors' attempted notice by publication satisfied the Due Process Clause, then Old Ben could sell the coal reserves "free and clear" of Methane's interest, and the bankruptcy court could enjoin the State Court Action. But if the Constitution required more, then the bankruptcy court could conclude, as it did, that Methane is not "bound by the terms" of the court's previous orders. *In re Johns-Manville Corp.*, 600 F.3d 135, 158 (2d Cir. 2010).

### A.

We begin with the basics. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Greene v. Lindsey*, 456 U.S. 444, 449–50 (1982) (emphasis omitted) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)); *see* U.S. Const. amend. V. Therefore, the Supreme Court has long held that "property cannot be subjected to a court's judgment unless reasonable and appropriate efforts have been made to give the property owners actual notice of the action." *Shaffer v. Heitner*, 433 U.S. 186, 206 (1977); *see Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233 (1864).

"[W]hether a particular method of notice is reasonable," and can thereby pass constitutional muster, "depends on the particular circumstances." *Tulsa Pro. Collection Servs., Inc. v. Pope*, 485 U.S. 478, 484 (1988). For instance, mere constructive notice—such as by publication—is often all one can do in attempting to contact "unknown parties" and, thus, all that due process demands. *Mullane*, 339 U.S. at 317; *Tulsa*, 485 U.S. at 490. But the "general rule" is that "notice by publication is not enough with respect to [an entity] whose name and address are known or very easily ascertainable and whose legally protected interests are directly affected by the proceedings in question." *Schroeder v. City of New York*, 371 U.S. 208, 212–13 (1962). After all, "[i]t is common knowledge that mere newspaper publication rarely informs a landowner"—or anybody else—"of proceedings against his property." *Walker v. City of Hutchinson*, 352 U.S. 112, 116 (1956).

These principles apply in bankruptcy proceedings just the same. *See Bank of Marin v. England*, 385 U.S. 99, 101–02 (1966); *United States v. Cardinal Mine Supply, Inc.*, 916 F.2d 1087, 1090–91 (6th Cir. 1990). A bankruptcy court cannot discharge one's property interest without adequate notice. *See Lampe v. Kash*, 735 F.3d 942, 943–45 (6th Cir. 2013). And the adequacy of the notice depends on whether the interested party is "known" or "unknown." *See In re Motors Liquidation Co.*, 829 F.3d 135, 159 (2d Cir. 2016); *In re Arch Wireless, Inc.*, 534 F.3d 76, 80–81, 83 (1st Cir. 2008); *Chemetron Corp. v. Jones*, 72 F.3d 341, 345–46 (3d Cir. 1995). "Known" parties are those "whose identity" and interest are "either known or 'reasonably ascertainable by the debtor.'" *Chemetron*, 72 F.3d at 346 (quoting *Tulsa*, 485 U.S. at 490). For them, due process generally requires that the debtor attempt to provide notice directly. *See Tulsa*, 485 U.S. at 487; *Robinson v. Hanrahan*, 409 U.S. 38, 40 (1972) (per curiam). Conversely, those "whose interests or whereabouts could not with due diligence be ascertained" are considered "unknown," and the "employment of an indirect and even a probably futile means of notification . . . creates no constitutional bar to a final decree foreclosing their rights." *Mullane*, 339 U.S. at 317; *see also Tulsa*, 485 U.S. at 490 ("[I]t is reasonable to dispense with actual notice to those with mere 'conjectural' claims." (quoting *Mullane*, 339 U.S. at 317)).

B.

With this governing framework in place, we now turn to Methane's interest.  Neither the bankruptcy court nor the district court defined the nature of the Delay Rental Obligation.  But as the parties' briefing makes clear, "the reasonableness of constructive notice" in this case is intertwined with "the nature of the property interest at stake."  *Davis Oil Co. v. Mills*, 873 F.2d 774, 790 (5th Cir. 1989); *see also In re J.A. Jones, Inc.*, 492 F.3d 242, 250–51 (4th Cir. 2007).  Alliance contends that Methane held a pre-petition "contingent claim that was merely future, conjectural, and speculative," while Methane says the Delay Rental Obligation is a "vested, non-contingent real property right."  That distinction matters for the due-process inquiry.  *See Mullane*, 339 U.S. at 317–18; *Tulsa*, 485 U.S. at 490.

Because the coal reserves are located in Illinois, that state's law governs the interest Methane received through the Old Ben Deed.  *See, e.g.*, Restatement (Second) of Conflict of Laws §§ 223(1), 235 (Am. Law. Inst. 1971); *De Vaughn v. Hutchinson*, 165 U.S. 566, 570 (1897).  Applying that law, we agree with Methane that the Delay Rental Obligation conferred a "vested property interest"—specifically, a covenant running with the land—and not, as Alliance believes, some run-of-the-mill contingent claim.

For a covenant to run with the land in Illinois, "three criteria must be met: (1) the covenantor and the covenantee must have intended the covenant to run with the land; (2) the covenant must touch and concern the land; and (3) there must be privity of estate between the party claiming the benefit of the covenant and the party resting under the burden of the covenant."  *Nassau Terrace Condo. Ass'n v. Silverstein*, 537 N.E.2d 998, 1000 (Ill. App. Ct. 1989) (citing *Streams Sports Club, Ltd. v. Richmond*, 457 N.E.2d 1226, 1230 (Ill. 1983)).  "Where a covenant runs with the land, the benefit or obligation of the covenant will pass with ownership."  *United City of Yorkville v. Fid. & Deposit Co. of Md.*, 143 N.E.3d 69, 97 (Ill. App. Ct. 2019).

1.

There can be no doubt that Old Ben and Methane intended the reciprocal covenants in the Old Ben Deed—including the Delay Rental Obligation—to run with the land.  "The intent of the parties can best be determined by express contractual provisions."  *Streams Sports*, 457 N.E.2d at 1230.  And here, Old Ben explicitly sold the coalbed gas rights to Methane "[s]ubject to" a number of "covenants, running with the ownership of the coal and methane gas."  After setting forth those covenants, the deed reiterated that "[t]o the extent that Grantor or Grantee shall convey the surface, coal[,] or methane gas, the above agreements, terms, and restrictions shall be covenants running with the land[.]"  The deed once more stated that Old Ben "reserve[d] unto itself, and its successors, assigns, and lessees, the coal and all minerals associated with the coal . . . and the right to mine and remove any and all of the coal"—but again, only "subject to the covenants contained in this deed."  Thus, "[t]he language of the deed clearly indicates that the parties intended" for the Delay Rental Obligation to run with the land and bind successors. *See Drayson v. Wolff*, 661 N.E.2d 486, 493 (Ill. App. Ct. 1996).

2.

"Regarding the second part of the test, a covenant touches and concerns the land if it affects the use, value, and enjoyment of the property."  *Bank of Am., N.A. v. Cannonball LLC*, 12 N.E.3d 841, 848 (Ill. App. Ct. 2014); *see Nassau*, 537 N.E.2d at 1001; *Purvis v. Shuman*, 112 N.E. 679, 682 (Ill. 1916).  This does not "so much depend on whether [the covenant] is to be performed on the land itself as on whether it tends directly or necessarily to enhance its value, or render it more beneficial and convenient to those by whom it is owned or occupied."  *Louisville & Nashville R.R. Co. v. Illinois Cent. R.R. Co.*, 51 N.E. 824, 825 (Ill. 1898) (citation omitted); *see Streams Sports*, 457 N.E.2d at 1230; *Purvis*, 112 N.E. at 682; *Parrish v. City of Carbondale*, 378 N.E.2d 243, 247 (Ill. App. Ct. 1978).

Employing this formulation, Illinois courts have frequently held that "[p]ayments made in connection with the use or ownership of land" constitute "covenants running with the land." *C-B Realty & Trading Corp. v. Chi. & N. W. Ry. Co.*, 556 N.E.2d 634, 637 (Ill. App. Ct. 1990) (collecting cases); *see Cannonball*, 12 N.E.3d at 848–50; *McAnelly v. Graves*, 467 N.E.2d 377,

381 (Ill. App. Ct. 1984); *Streams Sports*, 457 N.E.2d at 1229–31; *Webster v. Nichols*, 104 Ill. 160, 176–77 (1882). For example, in *Streams Sports*, a condominium owner was assessed a membership fee for the use of nearby recreational facilities. *See* 457 N.E.2d at 1229–30. She asserted that the fee arrangement had been a mere "personal covenant" between the prior owner and original developer that was "no longer binding" on successors-in-interest. *Id.* at 1230. But the Illinois Supreme Court rejected her argument. It held that "the burden of furnishing the $216 annual fee" for the facilities ran with the land, as the covenant affected the "use[]" and "enjoy[ment]" of the property held "by the residents of the condominiums" in the "common building plan." *Id.* at 1230–31.

So too here. The Delay Rental Obligation "is not simply a personal financial obligation between" Old Ben and Methane, *Cannonball*, 12 N.E.3d at 850, as Alliance suggests. Rather, the real covenant "directly affect[s] the value of both" the coal and methane estates. *Id.* Without it, the methane estate is worth less (because the holder will receive no compensation for the delay and exploitation of the coalbeds containing the natural gas), and the coal estate is worth more (because the owner can freely exercise its coal mining rights without an obligation to pay rent). *See id.*; *U.S. Fid. & Guar. Co. v. Old Orchard Plaza Ltd. P'ship*, 672 N.E.2d 876, 885 (Ill. App. Ct. 1996); *Nassau*, 537 N.E.2d at 1001; *McAnelly*, 467 N.E.2d at 381. Likewise, the covenant directly affects and relates to the parties' use and enjoyment of their respective estates. *See Cannonball*, 12 N.E.3d at 850 (citing *C-B Realty*, 556 N.E.2d at 637). As the burdened party, the owner of the coal could develop and mine previously unexplored areas only by paying rent. And as the benefited party, Methane would receive this rent to compensate it for the disturbance of the coalbed gas and the land that became "unavailable to [it] for methane gas production."

3.

Finally, there is "a chain of privity between the original covenantee, covenantor[,] and the subsequent part[y] to be bound by the covenant." *St. Paul Fed. Bank for Sav. v. Wesby*, 501 N.E.2d 707, 710 (Ill. App. Ct. 1986). First, the Old Ben Deed created a horizontal privity of estate between Old Ben and Methane. *See Nassau*, 537 N.E.2d at 1001; *Creighton v. Elgin*, 69 N.E.2d 501, 508 (Ill. 1946); *Atwood v. Chi., Milwaukee & St. Paul. Ry. Co.*, 229 Ill. App. 71,

76–77 (1923).  And second, Alliance has never disputed that it is in vertical privity with Old Ben as a successor to its interest in the Hamilton County coal reserves.  *See Nassau*, 537 N.E.2d at 1001; *Wesby*, 501 N.E.2d at 710.

4.

Despite Methane's clear assertion in this court, and in the courts below, that it held a vested covenant running with the land, Alliance chose not to brief the issue.  Instead, it simply stated that this was "a legal determination which has never been made" and that it "strongly contests."  It then dropped a footnote pointing to the briefs it filed in the bankruptcy court.[1]

Those briefs contained three attempts by Alliance to "reject any assertion that the Delay Rental Obligation is a 'covenant' running with the land or a 'vested' property right of any kind." None is persuasive.  First, Alliance cited a case that held that a purchaser was not personally liable for a previous owner's mortgage when "he did not assume or agree to pay" it.  *See Scholten v. Barber*, 75 N.E. 460, 461 (Ill. 1905).[2]  With no further explanation, or citation of authority, Alliance baldly asserted "that the same principle applies to other financial payments related to the land, such as the alleged Delay Rental Obligation here."  Yet, as mentioned above, that contention is flatly contradicted by a great deal of Illinois precedent.  *See, e.g.*, *Cannonball*, 12 N.E.3d at 850; *La Salle Nat'l Tr., N.A. v. Vill. of Westmont*, 636 N.E.2d 1157, 1174 (Ill. App. Ct. 1994); *C-B Realty*, 556 N.E.2d at 637; *Wesby*, 501 N.E.2d at 710; *Streams Sports*, 457 N.E.2d at 1230–31; *McAnelly*, 467 N.E.2d at 381; *Webster*, 104 Ill. at 176–77; *see also Mackin v. Haven*, 58 N.E. 448, 454 (Ill. 1900) ("The covenant in a lease or deed to pay rent is one that runs with the land.").

---

[1]At oral argument, Alliance suggested that the nature of Methane's interest is not in play here because the bankruptcy court told the parties not to address it at the merits hearing.  But it was Alliance who then argued—both at that hearing and throughout the subsequent proceedings—that the nature of Methane's interest mattered for the due process-inquiry, alleging that Methane held only a future and speculative claim.  When Methane responded that Alliance was wrong because the Delay Rental Obligation was a vested and present real property right, Alliance chose to simply stand on its briefs from the bankruptcy court.

[2]"In such a case there can only be a decree *in rem*," rather than an *in personam* judgment, "and the proper form is to find the amount due to the mortgagee, and to order the mortgaged premises sold, unless such amount shall be paid within a time limited by the decree."  *Crawford v. Nimmons*, 54 N.E. 209, 210 (Ill. 1899) (cited approvingly in *Scholten*).

Second, Alliance noted that "[i]n Illinois, even if parties expressly state that a covenant runs with the land, it may not run with the land." That is true. But as Alliance's own cited authority makes clear, that is because the covenant must *also* touch and concern the land. *See Keogh v. Peck*, 259 Ill. App. 503, 512–17 (1931). Here, the Delay Rental Obligation fulfilled this requirement as well.

Third, Alliance said that the Delay Rental Obligation is only a "personal arrangement" because it is "a promise to make payments based on future events."[3] But such contingencies do not alter the nature of Methane's vested property interest. After all, the future events that would trigger payment directly relate to the parties' use and development of the land.

On this point, *McAnelly* is instructive. There, a lessee made an advance royalty payment of $35,000 to the lessor of a coal estate. 467 N.E.2d at 378. The lease contained a covenant providing that if the lessee "had failed to begin mining operations within 24 months," then the lessor could exercise an option to "terminate the lease" and refund "$30,000 of the advance royalty payment." *Id.* That this promise related to future, contingent events did not faze the court; it held that "the right to terminate under the lease was itself a benefit that passed with ownership of the land," and the "duty to refund unearned royalties upon termination was a corresponding burden that likewise ran with the land." *Id.* at 381. *Old Orchard Plaza* is to the same effect. The covenant there "requir[ed] the landlord to pay the tenant $2 million if the tenant d[id] not exercise an option to extend the term of the lease." 672 N.E.2d at 884–85. The court explained that this covenant touched and concerned the land because "[c]learly, without such a provision, the leasehold is worth less, and the fee simple is worth more." *Id.* at 885. The same is true here.[4]

---

[3]To support this point, Alliance cited *Seiler v. Zeigler Coal Holding Co.*, 782 N.E.2d 316, 319 (Ill. App. Ct. 2002). But as Alliance itself noted, the court in that case found that the covenant did not run with the land due to the personal nature of the language granting rights in the agreement. *See id.* at 319–21. The deed in this case, by contrast, thrice stated that Old Ben "and its successors, assigns, and lessees" would retain the coal rights "subject to the covenants contained in th[e] deed."

[4]Indeed, in *Old Orchard Plaza*, whether the burdened party would have to pay per the covenant was based on the unilateral decision of the benefitted party. In the present case, the burdened party would only have to pay based on its *own* decision to mine coal in an unexploited area. That is all the more reason to believe the burden of the Delay Rental Obligation would run with the land.

C.

Having determined that the burden of the Delay Rental Obligation ran with the land, this case becomes straightforward. Methane was a known party with a known, present, and vested interest in real property; it was thus entitled to more than publication notice. *See, e.g.*, *Tulsa*, 485 U.S. at 489–90; *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 (1983); *Mullane*, 339 U.S. at 318; *see also City of New York v. N.Y., New Haven & Hartford R.R. Co.*, 344 U.S. 293, 296–97 (1953) (holding the same was required under the bankruptcy code).

1.

To start, the bankruptcy court determined that Old Ben knew of—or at least could have "reasonably ascertain[ed]"—Methane's interest. Because we review this factual finding for clear error, we may set it aside only if, after reviewing the full record, we are "left with the definite and firm conviction that a mistake has been committed." *In re Burke*, 863 F.3d 521, 528 (6th Cir. 2017) (quoting *In re DSC, Ltd.*, 486 F.3d 940, 944 (6th Cir. 2007)).

The bankruptcy court provided five reasons why "Old Ben knew or should have known of [Methane's] Interest." First, this was "not an association by chance." The parties had a "direct relationship" and "knowingly entered into a transaction" worth $2.6 million. In other words, the parties held interests in the same land, and did so only because Old Ben itself had conveyed the gas rights to Methane. Second, this was not some minor conveyance from centuries or even decades ago; "Old Ben filed [for] bankruptcy less than five years" after "this significant and sizeable transaction." Third, the conveyance—which included the Delay Rental Obligation—"is memorialized in the Old Ben Deed" and formally recorded in the Hamilton County land records. Fourth, Methane's interest was "reasonably ascertainable from [Old Ben's] records." Alliance's counsel conceded the transaction was contained in those records, and it "reasonably follow[ed]" that Methane's Interest was included as well." Not to mention, Methane's interest was "undeniably reviewed" as part of the due diligence AEI and Old Ben performed in the merger that took place "less than 90 days after" the conveyance. Fifth, the bankruptcy record also "should have triggered further review." For example, one document referenced the "Hamilton County Treasurer," which "shows that Old Ben was aware there were

interests in Hamilton County." And one of the Debtors' real property schedules alluded to an "easement/right of way" in Illinois that was held by Methane as "lessee."

In light of all these factors, the bankruptcy court determined that Old Ben at least "would have known of Methane's Interest upon conducting a diligent search." We see no clear error in that finding.

Attempting to resist this conclusion, Alliance stresses that "[t]he Delay Rental Obligation was not an account payable or certain long-term liability which would be tracked in financial or accounting records." Maybe not. But a debtor's "'reasonably diligent efforts'" to identify interested parties requires, at the very least, "a careful search of the debtor's own records." *In re Crystal Oil Co.*, 158 F.3d 291, 297 (5th Cir. 1998) (quoting *Mennonite*, 462 U.S. at 798 n.4); *see Chemetron*, 72 F.3d at 346–47. A reasonably diligent debtor would not simply turn a blind eye to anything outside its financial statements in conducting that search. *See In re Union Hosp. Ass'n of the Bronx*, 226 B.R. 134, 139 (Bankr. S.D.N.Y. 1998) ("Certainly a debtor cannot hide behind a cursory review of its books and records."). After all, other internal records will often readily reveal third-party interests. *See In re Arch Wireless*, 534 F.3d at 81 (upholding determination that "Nationwide was a 'known creditor' because its claim against Arch was reasonably ascertainable from the correspondence between the two companies"); *In re Motors Liquidation Co.*, 829 F.3d at 160 (same where GM received "reports and complaints" and its "own personnel" had discovered an ignition switch defect in certain cars); *In re Maya Constr. Co.*, 78 F.3d 1395, 1398 (9th Cir. 1996) (same for "formal written demand").

In addition, courts have recognized that "[s]ituations may arise" where a third party's interests "are 'reasonably ascertainable,' although not identifiable through the debtor's books and records." *In re Placid Oil Co.*, 753 F.3d 151, 157 n.5 (5th Cir. 2014) (quoting *Chemetron*, 72 F.3d at 347 n.2). This would be one of those situations. The Delay Rental Obligation was a recorded interest in real property. *See Walker*, 352 U.S. at 116; *Verba v. Ohio Cas. Ins. Co.*, 851 F.2d 811, 816 (6th Cir. 1988). And, beyond that, it was created and conveyed to Methane *by Old Ben* from an estate that Old Ben still owned at the time of the bankruptcy. Like the bankruptcy court, we find it difficult to believe that Old Ben could not reasonably identify Methane's recorded interest only a few years after it conveyed that same interest—directly to

Methane. *See also Mennonite*, 462 U.S. at 798 ("When the mortgagee is identified in a mortgage that is publicly recorded, constructive notice by publication must be supplemented by notice mailed to the mortgagee's last known available address, or by personal service.").

Next, Alliance boldly claims that "a search of the Debtors' or public records for potential interests in the Debtors' real property would . . . be unlikely to reveal the Delay Rental Obligation," because Old Ben conveyed the interest "out" to Methane. Again, though, the interest was duly recorded. It was conveyed by Old Ben directly to Methane. It affected Old Ben's ability to mine its coal reserves. And as the bankruptcy court observed, the deed also "includes reciprocal covenants in favor of and against Old Ben." Would Old Ben—a sophisticated corporation in the coal business—not retain a copy of the deed "out" detailing both its obligations and its rights to mine the coal on its own property? The bankruptcy court thought not. We see no error in that conclusion.

In sum, Methane's interest was reasonably ascertainable by Old Ben. The bankruptcy court's finding in this regard was not clearly erroneous.

2.

Alliance also raises a host of legal arguments, principal among them that the Delay Rental Obligation was simply "a future, conjectural, and speculative claim." But that's just not the case. It is well settled that a covenant running with the land "is an interest in real property." *Gouveia v. Tazbir*, 37 F.3d 295, 299 (7th Cir. 1994); *see also* 9 Powell on Real Property § 60.04 (2021) ("Most jurisdictions now consider all covenants to be interests in real property."). And furthermore, "it is a present, not a future, interest in property." *In re Cnty. Treasurer*, 869 N.E.2d 1065, 1087 (Ill. App. Ct. 2007). Thus, upon execution of the Old Ben Deed, "the covenant running with the land became effective" and "vest[ed] an immediate interest" in Methane. *Mathis v. Mathis*, 83 N.E.2d 270, 274 (Ill. 1948). That present and vested interest, moreover, was known to Old Ben.

Accordingly, Old Ben's "notice by publication [was] adequate only [if] 'it [was] not reasonably possible or practicable to give more adequate warning.'" *Jones v. Flowers*, 547 U.S. 220, 237 (2006) (quoting *Mullane*, 339 U.S. at 317). Based on our review of the record, "there

seem to be no compelling or even persuasive reasons why [some kind of personal] notice [could not] be given" to Methane.  *Walker*, 352 U.S. at 116.  Nor has Alliance offered any.  In fact, the mailing address for Methane's counsel (the company's Illinois registered agent), has "remained unchanged" since April 1998.  And the "mailing address for Illinois Methane as listed on the Old Ben Deed[]" is the "same address [it] has used for [its] Illinois oil and gas business since June 1991."  A simple letter to one of these addresses "would have apprised [Methane] that [its] property was about to be taken and that [it] must appear if [it] wanted to be heard."  *Id.*; *see Mennonite*, 462 U.S. at 798–800.  But Old Ben failed to take even this modest, "inexpensive and efficient" step toward providing actual notice.  *Tulsa*, 485 U.S. at 490.

Alliance also complains that *payment* per the Delay Rental Obligation "was conditional upon multiple contingencies and future events."  As an initial matter, payment was really only contingent on one event—the owner of the coal estate deciding to mine in an unexploited area.  More importantly, though, just because the Delay Rental Obligation "depends on a contingency does not affect the fact that it has a prospective value."  *Patterson v. Durand Farmers Mut. Fire Ins. Co.*, 24 N.E.2d 740, 743 (Ill. App. Ct. 1940); *see Old Orchard Plaza*, 672 N.E.2d at 884–85.  The Delay Rental Obligation had intrinsic value to Methane at the time of the bankruptcy sale, even though it had not yet been triggered.  The covenant represented a recorded interest in real property that precluded the owner of the coal estate—a coal mining company—from mining coal and thereby preventing the production of natural gas without paying Methane rent.  The value of this property right, with all of its concomitant benefits, was presumably included in Methane's $2.6 million purchase price.  And "to release the debtor from [this] recorded covenant [would be] to take a property interest away from [Methane] and give the debtor['s successors] a property interest which the debtor never had in the first place."  *In re Foster*, 435 B.R. 650, 661 (B.A.P. 9th Cir. 2010) (quoting *In re Rivera*, 256 B.R. 828, 834 (Bankr. M.D. Fla. 2000)).

In addition, Methane is right that none of the cases cited by Alliance concerns the same, or even a similar, type of vested property right.  Instead, each of those cases involved speculative tort or tort-like claims by plaintiffs whose interests were not reasonably ascertainable by the debtor at the time of bankruptcy.  *See Dahlin v. Lyondell Chem. Co.*, 881 F.3d 599, 606 (8th Cir. 2018) (benzene exposure claim); *In re Placid Oil*, 753 F.3d at 157 (asbestos exposure claim);

*Chemetron*, 72 F.3d at 344–45, 347 (radiation exposure claim); *In re Motors Liquidation Co.*, 576 B.R. 761, 765–66, 778 (Bankr. S.D.N.Y. 2017) (malicious prosecution claims related to GM employees' testimony where courts had affirmed plaintiff's conviction eight times by the time of bankruptcy); *In re Enron Corp.*, No. 01-16034 (AJG), 2006 WL 898031, at *5 (Bankr. S.D.N.Y. Mar. 29, 2006) (claim by the state of Montana stemming from FERC proceedings that had neither concluded nor produced any documentation); *In re XO Commc'ns, Inc.*, 301 B.R. 782, 795 & n.7 (Bankr. S.D.N.Y. 2003) (preference claim by creditor that filed for bankruptcy before the debtor had); *In re Union Hosp. Ass'n*, 226 B.R. at 139 ("No matter how hard the debtor searched its own books and records, it would not have discovered the potential claims for contribution and indemnity[.]"); *In re Trump Taj Mahal Assocs.*, No. 93-2056, 1993 WL 534494, at *4 (D.N.J. Dec. 13, 1993) (slip-and-fall case where plaintiff filed incident report a year before the bar date "but refrained from further communication" and ignored debtor's letter seeking to resolve the matter); *In re L.F. Rothschild Holdings, Inc.*, No. 92 CIV. 1129 (RPP), 1992 WL 200834, at *4 (S.D.N.Y. Aug. 3, 1992) (employment dispute where employee "gave no notice to [company] that he had any claim against [it]"); *see also In re Charter Co.*, 125 B.R. 650, 653, 656 (Bankr. M.D. Fla. 1991) (contractual dispute where it appeared that an oil supplier "had abandoned its claim" and the debtor reasonably "believed the dispute was resolved" years earlier).[5]  Alliance's counsel even conceded at argument that he could not point to any case in which publication notice had been found sufficient to eliminate a known party's present interest in real property.

---

[5]Alliance also asserts that the bankruptcy court erred by not following *Giese v. Community Trust Bank*, 549 B.R. 469 (Bankr. E.D. Ky. 2016), *aff'd* 585 B.R. 837 (B.A.P. 6th Cir 2018), *aff'd* 761 F. App'x 553 (6th Cir. 2019). But that decision is not binding on us.  *See Phar-Mor, Inc. v. McKesson Corp.*, 534 F.3d 502, 507 (6th Cir. 2008). Nor is it even clear that *Giese* bound the bankruptcy court, as "bankruptcy courts in this circuit have reached conflicting conclusions regarding the precedential effects of bankruptcy appellate panel decisions." *In re Boyd*, 414 B.R. 223, 231 n.12 (Bankr. N.D. Ohio 2009) (citation omitted).  In any event, it appears that the two non-leasing heirs in *Giese*—who assigned their respective rights to the plaintiff there—were unknown and had unknown claims to the funds in the bank account at issue. *See* 549 B.R. at 477–78, 481–82; 585 B.R. at 848–49.  Thus, the debtors' publication notice satisfied due process.  For the reasons described above, this case is different.  Methane was a known party who held a reasonably ascertainable and "publicly recorded" interest in Old Ben's real property. *Mennonite*, 462 U.S. at 798.

In short, Alliance is wrong that the Delay Rental Obligation "is the type of future, conjectural, and speculative claim for which publication notice satisfies due process." Quite the opposite. The covenant was a present, vested, and readily ascertainable interest in real property that was held by a known party. As such, Old Ben's publication notice was constitutionally deficient. *See Mennonite*, 462 U.S. at 798–99. And "due process prevents [Methane] from being bound" by the bankruptcy court's previous orders. *Richards v. Jefferson Cnty.*, 517 U.S. 793, 802 (1996); *see also Griffin v. Griffin*, 327 U.S. 220, 228–32 (1946).

3.

Finally, Alliance turns to public policy considerations, urging that reversal would further the "federal interest in encouraging the finality of bankruptcy sales" and also promote "confidence in the bankruptcy sale process." This, however, ignores that "[t]he bankruptcy power is subject to the Fifth Amendment[]," *United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982), and that the bankruptcy code is itself "founded in fundamental notions of procedural due process," *In re Savage Indus., Inc.*, 43 F.3d 714, 721 (1st Cir. 1994).

We do not doubt that a "free and clear" sale under § 363(f) is a powerful tool that can further the "general Code policy of maximizing the value of the bankruptcy estate." *See Toibb v. Radloff*, 501 U.S. 157, 163 (1991). But it cannot be used indiscriminately to short-circuit the paramount protections of due process. *See Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989) ("[W]here a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy or probate, legal proceedings may terminate preexisting rights *if the scheme is otherwise consistent with due process*." (emphasis added)); *see also Ray v. Norseworthy*, 90 U.S. (23 Wall.) 128, 135–37 (1874).

Notwithstanding Alliance's policy argument, then, we hold that the bankruptcy court did not err in refusing to enjoin the State Court Action. The constitutionally "[i]nadequate notice" here means that Methane's "suit may proceed." *Chemetron*, 72 F.3d at 345–46; *see Lampe*, 735 F.3d at 945; *In re Motors Liquidation Co.*, 829 F.3d at 159, 166; *In re Savage Indus.*, 43 F.3d at 721 (observing that the "concern for *finality* in bankruptcy sales 'will not . . . protect a

party buying from the trustee in a sale free and clear of liens where no notice is given to the lienholder'" (citation omitted)).

\* \* \*

We AFFIRM.